All right, our third case is United States v. Sanchez-Garcia, Ms. Fluff. Good morning, your honors. May it please the court, I'm Maree Fluff, and I represent the appellants today, the six appellants, and I reserve five minutes for rebuttal. We are here because of Title VIII United States Code 1326 and its shameful history, a history that is tethered to a racial bias that remains unconfronted. Section 1326's unconfronted shameful history is clearly apparent in the congressional records and in the record before this court. Ever since its enactment, Section 1326's enforcement has had a disparate impact on Mexican and Latin American immigrants and their families. Those same immigrants and families have been impacted by the racial animus that was a motivating factor in 1326's enactment in 1929, its reenactment in 1952, and in its most recent versions. So I think there are at least three circuits that have heard this argument before, and they've all ruled against this argument. So are they all wrong? Yes, your honor. We would suggest to the court that they are all wrong in their analysis of this question for the following reasons. When you look at the Ninth Circuit's decision in Carrillo-Lopez, that opinion analyzed the 1952 Act only and stated that that was a complete revision of the statute, and that's not exactly true. The 1952 Act was a reenactment of 1929, and that 1952 Act still was tethered to the racial animus that surrounded the enactment in 1929. And so we do think that Carrillo-Lopez erroneously decided the decision in focusing only on the 1952 reenactment. It said it was going to consider the 1952 enacted statute, which is what your clients were prosecuted under, but relevant to its analysis of that statute under Arlington Heights was the history of the predecessor statute. And the court considered it, it just didn't treat it as dispositive. So is that what you think was the mistake? It is dispositive if a predecessor statute is enacted with racial animus? I do think so, Your Honor, and I would point to the court, to the language in Romney's case, Louisiana, where the court says that where a law otherwise is untethered to racial bias, and perhaps also where the legislature actually confronts the laws Todd repassed and reenacting it, the new law may well be free of discriminatory intent. Now, I think that what we have here is a law that is still tethered to that racial animus, where that has remained unconfronted, undiscussed. And so Ramos supports that position. But in looking at the other circuits that have decided this decision, in Barsena's Romualdo, the Fifth Circuit relied significantly on prior precedent there, Harness. And in Harness, that decision seemed to me to be inconsistent with this language that I just quoted to the court. Harness said that we had to look at the most recent enactment. And Ramos, Espinosa, and Hunter all discussed the fact that we should look at the original enactment and the original history of the statute before the court. But everyone, I guess, everybody is looking at that here. The Ninth Circuit looked at it. The government is not arguing that the history of the 1929 predecessor statute is irrelevant. I think they have general agreement, at least among the parties and the courts, that it's relevant under Arlington Heights. But it seems to me that you're arguing for something more than that, that it is at least presumptively dispositive. And I'm not getting that from the cases you're citing. Your Honor, let me restate my position. What I would say is that the 1952 statute is a reenactment of the 1929 statute. And that in the process and in the congressional records, when they were about— —that were made between 29 and 52, putting aside the fact that you had almost a completely new Congress at that time. Well, Your Honor, the revisions that occurred to 1326 were not major revisions. The revision that questioned was, instead of having the statute discuss the—make a—the proving of the entry of the individual under the statute, it expanded the statute to say that the government would have to prove that they were found in the United States. That simply expanded the prosecution and, in our opinion, expanded the disparate impact because it made it easier for the government to prove the criminal liability of individuals under the illegal reentry statute. Counsel, it's hard—it's hard for me to think about the 1952 INA, which completely overhauled the immigration system in this country, as a reenactment of this particular illegal reentry provision. There was a lot going on, right? I don't think—this case seems somewhat different to me than if we just had the 1929 Act and then that single provision was reenacted in 1952. That's not what happened. There were overhauls—overhauls to other portions of the statute, Your Honor, and other portions. But when you look at 1326 and the illegal reentry statute, the revisions were not that significant. Yeah, but—well, okay, I guess I'm saying I'm not—there were significant revisions even to that provision, but why is it right that we only look at that? I mean, what that section does, it's sort of an enforcement mechanism for the statute around it, and now it's enforcing a whole new immigration system. It just—why is it right that we should only look at that provision and not put it in the context of the statute that was—the full statute enacted in 1968? Because that is the portion that impacts the individual's life and liberty, and that is the portion that subjects individuals to a prison time. And that is the portion that is—that the government proceeded under in prosecuting the appellants. But even, Your Honor, if you look at 1952 and its enactment, its enactment is problematic. And, you know, I hear what you're saying, Judge Harris, that 1929—everybody sort of conceded that 1929 was problematic. Even the district court said in the joint appendix that, I'll concede that 1929 is problematic. And the question is, you know, did 1952 purge that issue? I don't think that is the question. Under Abbott, I think—doesn't Abbott suggest that there's no purging to be done? We treat that—we come to the 1952 statute with a presumption that it was enacted in good faith, and the burden is on you to show that, no, this one was discriminatory, too? Well, I think Abbott stands for our proposition, Your Honor, because in Abbott, there was a complete revision of that decision. And in completely revising that decision that was at question in Abbott, they did address the taint. And here, our case is more akin to Hunter v. Wood, where they looked at an old revision, and then there were some minor revisions, but— I have to say, I think Hunter is a really different case. In Hunter, the disenfranchisement was being worked under the original provision. And then there had been some judicial decisions after that that pruned back parts of it, but the thing that was doing the work in that case was literally the original provision. It would be like if your clients were being prosecuted under the 1929 Act, and of course that's what we looked at. But I would suggest to the court that they are being prosecuted under the 1929 Act, and on its reenactment, that the congressional records for 1956 specifically say that this is a reenactment of 1326, or a reenactment of the criminalization of individuals entering and reentering after deportation. Your clients are being prosecuted under Section 1326, which was enacted in 1952, right? Even the 1952 enactment has problematic issues. When you look at the congressional record there, and look at the historical background of 1952— What about the—we usually look for committee reports, floor explanations, that sort of thing. Not straight comments, you know, you can turn on C-SPAN anytime and somebody will get up at 9 o'clock at night when there's nobody in the chamber and spout on until their time runs off. But we don't look at the comments of particular members of a particular Congress that happened to occur like that, just because there's a bill that happened to pass the Congress that this particular speaker voted for. You can turn on National News any night, regardless of the network, and you'll find various members of Congress, usually not in leadership positions, who will spout off on all forms of the ideological spectrum. And if by happenstance, a bill passes that they spoke favorably for, we don't look to what they said. Your Honor, I agree. But under Arlington Heights, we are to look at the historical record, all the Arlington Heights factors. And when you look at the 1952 reenactment, there is congressional record. If you look at Joint Appendix 134 through 399, those are the congressional debates from May of 1952. And when you look at that Joint Appendix, Your Honor, Senators McCarran and Humphrey, they expressed racial slurs and racial intent. And I went back and looked at it and counted on page 134, one time when the racial slur was mentioned, and I'm referring to the term wetback. 143, one time where it was mentioned. 144, one time where it was mentioned. Joint Appendix 254 is mentioned again. Well, again, I mean, is that the sponsor of the bill? Is that in the committee report? That was the sponsor of the bill, Senator McCarran. And, you know, when you add to that, that at the same time, months before, and this is in Joint Appendix 923. Were they speaking to 1326? They were speaking to the question of how to manage undesirable aliens and how to manage the Mexican question and how to manage. But didn't that go to a quota system? It didn't go to the statute. Specifically in the congressional debates, it did go to a quota system, Your Honor, and specifically with the wetback bill from March of 1952, it did as well. But it's the language that's used by those senators. It's the context surrounding it, the historical backdrop of what is happening, the Mexican repatriation, the Braceros program, all of that that's happening during this time period. And even in the Senate bill 1515, when you look at pages 577, 579, 580, 585, 596, there are expressions of racism. And you couch that with two of the senators from 1929 saying that they're praising the 1952 reenactment for the protections of keeping undesirables away. And from 1929 to 1952, we have 23 years of data Congress that Professor Hernandez testified to. And it's in our joint appendix where she talked about, in joint appendix 469 and 470, our expert discussed the fact that within one year of enforcement of 1929, U.S. attorneys prosecuted 7,001 cases of unlawful reentry. That was a spike from 1,000 before that. By 1939, they had prosecuted more than 44,000 cases. And if you look at more recent statistics from the Sentencing Commission from 2017 to 2019, the statistics suggest that there's a significant amount, that there's 22,000 cases prosecuted there. 99% of those cases are Mexican immigrants or Latin American. But isn't that just a function of the reality of what's happening on the border these days? To a certain extent, it could be a function of what's happening on the border. But, Your Honor, one of the questions that Dr. Gonzalez-O'Brien discussed during his testimony is that we have a very similar border to the North. And that we have no statistics or some statistics with respect to the prosecutions on that border, but it's de minimis. And when you look at 1929, there was a Vermont, a senator from Vermont who talked about the fact that there's no need to prosecute Canadians coming along the northern border. And so, 1929, there's a... Maybe they're not here illegally. And yet we do not have those statistics to suggest whether they are in fact or not in fact here illegally. So what about the fact that the statute has been in place since 1952 for, what is it, 71 years? And Congress presumably is aware of the historical background of the statute. Clearly, immigration is a hot topic that is often discussed in Congress, even if no actual legislative action is taken. But there's certainly a lot of people talking about it. And yet it's chosen to keep the statute in place. And we can't say, I don't think, as Judge Agee pointed out, that even if we have straight comments from legislators in the middle of the night, that the modern-day Congress suffers from the same vestiges of racism and deplorable conduct of previous iterations of Congress. So what about that, the fact that the statute remains in place, notwithstanding that history? Your Honor, the statute has gone through further reenactments since 1952. There's been five reenactments. But those reenactments are still tethered on the racial animus and still tethered to that disparate impact. And nobody has, no one in Congress has addressed that. Well, why do you think they have to expressly say something? I mean, the reality is that we're not back in 1952 or 1929. It's a different world. I think the Supreme Court in Ramos says that they do need to address that. I think that Justice Alito's opinion in Espinoza says that they should address that. And even Hunter says that it should be addressed. And, you know, Congress has addressed certain other statutes in looking at the racial animus and disparate impact. They've addressed the crack cocaine disparity. They've even addressed it in the immigration setting in 1959 when they removed the quotas because of those concerns. I wanted to just go back to the amendments since the 1952 enactment. So your position is that each of those reenactments also, that as to each of those, you would say those also are motivated by racial animus? I would, Your Honor. I think they're still tethered to that original racial animus. They've not been addressed. And I would point the court to amicus brief that was filed. I don't have the docket number with me. But in one of the amicus briefs that was filed, they go through a very thorough discussion of how those amendments are tied to that racial animus. Well, I guess I know that on your theory that there needs to be like some kind of affirmative disavowal. That has not happened. But you are also arguing that if you look at the 1952 statute, I think you're making an independent argument that if you look at the history of the 1952 statute itself, there is also some independent evidence of racial animus. Is there anything like that that you would point to with respect to any of the reenactments since 1952? Or for those reenactments, is this really just about, I don't mean to minimize it, but your entire argument there would be the kind of the long shadow of the 1929 Act? Your Honor, if I may address, there's several questions there. It's not entirely only my opinion that the purge needs to be tainted. It's the opinion of the Supreme Court in Ramos and Justice Alito. I just meant the argument you're making today. I understand that you affirm the default. Your Honor, I do think that the amendments and the reenactments are under the long shadow of the racial animus that was present in 1929. And even if the court didn't want to go all the way back to 1929, there is still that racial animus and shadow in 1952. And all of the historical background on the sequence of events surrounding the 1929 enacted, the reenactment in 1952, that all of that together does support that those amendments are under that racial bias. Thank you, Counsel. Ms. Reese. Thank you, Your Honor, and may it please the court. Morgan Reese on behalf of the government from the Middle District of North Carolina. The issue before this court this morning is whether Section 1326 is constitutional and whether it violates the equal protection component of the Fifth Amendment. The answer to that question is that it does not violate that component and it is indeed constitutional. I'd like to begin by discussing quickly just the standard of review in this case. Of course, we're here on a de novo review, but I would just like to point out that the factual findings that were made by the district court here, including those that concern whether a legislative enactment was motivated by discriminatory purpose, are reviewed for clear error. And I think that's an important standard for this court to remember when making the decision in this case. The government offers two standards of review that this court can evaluate this statute. The first being rational basis and the second being the Arlington Heights standard, which has already been discussed this morning. The government submits that rational basis is an appropriate standard of review in this instance because of the unique nature of this particular law at issue. The other courts of appeal that have cited the issues in this case have all said, well, we don't have to pick between the two of them because it fails under either one. Why should we not follow what they did? I'm sorry for interrupting the court, but Your Honor is correct. The Fifth, the Ninth, and the Third Circuit have all made that same decision. Your Honor, it's an option for this court today. And much like the three circuits before us, this court does not have to answer that question. So if this court chooses not to do that, then I think that the court will come to the same conclusion either way. We do submit that rational basis review is the appropriate standard just because of the plenary power of Congress and the unique situation in which Congress is in. When legislating concerning powers of immigration. But turning to the substance of opposing counsel's arguments concerning Arlington Heights, we're confident that the statute also prevails just as the Fifth, the Ninth, and the Third Circuits have already found. And of course, under the Arlington Heights standard of review, the defendants, the opponents of the law, have to prove discriminatory intent and discriminatory impact. So it's really a putting the statute in context question. And we look at things like the historical background, the specific sequence of events, the legislative history, and then whether the law bears more heavily on one race than another. It's only then that the burden would shift to the proponent or the government to prove that the law would have been acted without the racial discrimination. So in this particular instance, there were some questions before as to whether or not we're talking about the 1952 law or the 1929 law. And I'd like to point the court to the fact that the 1952 law was not a reenactment. It repealed the law of the 1920s and it enacted an entirely new statutory scheme, the INA. And I think that's very clear by the layout that the Ninth Circuit has set forth in its very thorough opinion addressing the congressional history. There, they described it as a three-year searching review of our country's immigration laws and described it as a broad reformulation. Your Honors, in light of that, the question then becomes, what role does the 1929 law have in this court's analysis today? And it really only comes in as a factor under Arlington Heights, the historical nature. And I would point the court to the fact that it's over 20 years removed. It was the Congress in the 1952 had experienced an over 90 percent turnover. I think it was 96 percent, to be precise. And so we're dealing with a substantially different legislature, substantially different legislatures. And the Congress itself is just so far removed from that context. Can I ask you a question about the 1929 statute, since I do think everybody agrees that it's a relevant data point under Arlington Heights? What is the government's position on whether the 1929 act was based, at least in part, on racial animus? Well, Your Honor, I think here were the court, the district court's findings are, of course, important to incorporate into the analysis and the district court's findings here. As my opposing counsel has pointed out, the district court provided, I'm kind of willing to give you 1929 in terms of some underlying racist motivations being one of the factors there. But, you know, when you get much past that, I think that's a much dicier proposition. What's the position of the United States, though, on whether the 1929 act incorporated some degree of racial animus? You conceded in the Ninth Circuit, but I don't think you're conceding it here today. And I'm just wondering, what is the position of the government? Your Honor, I think Your Honor is correct. We're not conceding that here today. I think when we have to look to the overall context of the 1920s law. Why is the government conceding it in some courts and not others? Well, I think in the Ninth Circuit, the reason why that was was because the district, it came from the factual, the trial testimony and the concession in the district court level. So we were bound by that at the circuit court level in the Ninth Circuit. Was it conceded in the district court? I just I don't understand why the United States has more than one position on this. Sure. Your Honor, I understand. And I cannot speak to what the discrepancy is on that. But what I can offer the court is that today this is the position that we are offering the court. But even even still, the position is that the 1929 act was not based in any part on racial animus. That's the position. That's the position today, Your Honor. But I would offer this court that even still, even if this court were to assume that even if the government offered that as the position, I think that it doesn't change the analysis of this court here. And the reason for that being is that it's about the 1952 law. And so it's about what Congress said in 1952 and what their motivation was in 1952. And I do want to point to a couple of legal principles that I think are important. As this court is well aware, first, that there's a presumption of good faith by the legislature. And then second of all, Your Honors, there's a phrase or concept that I think is is not based in the precedent that we've been discussing, which is this concept of purging the taint of a prior legislature, which I think the Raymond case from the from this circuit really sort of maps on to the facts of this case today to show us that a later in time. Legislature need not purge the taint of an earlier in time one. And so I think that's an important consideration for this court to understand in framing. Can I stop you for a second so that that may be right, but I guess that the question I have is, if they're not going to purge the taint. Should we consider the fact that. Peppered throughout the consideration of the Karen Walter Act, repeated derogatory references to the term went back and it was a separate enactment of a so-called wetback bill. So far from purging the taint, it seemed like at least maybe not all, but some of the legislators who were considering 1952 continued to engage in the tropes that were prevalent back in 1929. So how are we to consider that? Yes, Your Honor. Well, I'll begin with the proposition, of course, that the remarks of individual legislatures, even sponsors of legislation, are not regarded as reliable measures of congressional intent. And that's from this court in Roy versus County of Lexington, South Carolina. But we also see this principle initiated by the Supreme Court and O'Brien and then Brnovich. So really what we get down to is the fact that the evidence offered by the opponents of the law here, they point to the language of forced four individuals in Congress, three senators and one congressman, those being Senators Humphrey, McCarran and Morse and then Congressman Walter. Your Honor, what's interesting about Senator McCarran, of course, is that he's the sponsor of this legislation. But then I also point the court to other statements that he made. And I think the Ninth Circuit did a thorough job, as I mentioned, in addressing that in which McCarran's also quoted on record talking about how this legislation erases any form of racial discrimination. And that was the motivating factor. So that's the first point. And then secondly, these comments that are by these senators and by this congressman, certainly reprehensible. They weren't about this particular provision. They were about anti harboring provision. They were about the quotas. And so I think that's further into the important analysis for the sport today as in putting things into context. And then lastly, Your Honor, I'll point specifically to Senator Humphrey. Can I ask about that? So is it really realistic to sort of slice this sort of excuse me for the description, slice the salami that thinly and say that because the legislature used a racist trope in describing a related, albeit different bill, we should simply ignore that when considering whether or not they acted with racist animus and with respect to another bill. That's and these bills are I mean, they're related provisions that are all related to immigration and the impact of immigration on certain groups of people. So are we really supposed to just, you know, close our eyes to what's happening here? I don't think that it would require the court to close its eyes or in any sense say that today these these terms are unacceptable. But I do think, again, coming back to context is important because these terms, while they are not about this provision, they're also used by individuals who are offering. The alternative viewpoint. So there's the McCarran-Walter bill, but then there's also the Humphrey-Lehman bill that was offered in at the same time to oppose that bill. And the Humphrey-Lehman bill also contained the same provision 1326 within it. So I think when you look at the balance of the factors here, it just doesn't show that the legislature as a whole had a substantial or motivating factor behind it. And that's the standard that this court has to apply when evaluating the cases before us in considering whether legislatures as a whole have made this decision. We look to a case like Hunter versus Underwood, which is certainly not the case we have in front of the court today. But then we also looked at on the other end of the spectrum where it wasn't enough. O'Brien and Brnovich. And I just think at the end of the day, when the court really looks at the numbers, really looks at the context of the situation. These just simply don't rise to the level of sufficient evidence to prove that a racially discriminative intent was the motivating or substantial factor here. So even if let's say we disagree with you and think that there's still some lingering concern that exists in 1952, do you think that it's relevant that since then we've had 70 plus years of consideration of related and perhaps even the same provision by different Congresses? And there's no evidence that there's any racial animus with respect to their actions. Do you think that's dispositive and purging the taint in this case, even if no particular Congress made an affirmative statement to that effect? Well, Your Honor, I would first submit that I don't think that the Congress has to, quote, purge the taint. I think that that's a theory that was if we look at the Raymond case, we can see the analysis of this court in the Raymond case talking about there is no obligation by a later in time legislature to purge the taint. But I do think that that, Your Honor's point is a good one, which is that this statute has been enacted several times since the 1950s. It was enacted in 1988 for enhanced penalties with defendants with prior convictions, 1990 for increased fines in the Immigration Act, 1994 it increased the penalties again, and in 1996, 1326D was added to expand the class of prosecutable defendants. I think this all goes to the question that the court is really asking about, which is whether or not the statute would have been enacted even in the absence of any discriminatory intent. These later in time amendments prove that, yes, it would have been and indeed it was. So I think when looking at the overall context of this law, its history from the beginning to the end, it's clear that even if this court were to determine there was some sort of discriminatory impact here, excuse me, discriminatory intent, the legislature, because of the importance of this sort of legislation within the overarching scheme of our immigration laws, would have been enacted even in the absence of any discriminatory intent. All of that to say, taking these situations and history into context is what the government's asking the court to do here today. Applying the law as it has been established by this court in Raymond and by the Supreme Court in Abbott, these are the standards that this court should apply when evaluating the 1952 law, which is at issue here. Unless this court has any further questions, I will submit on our briefs. Thank you. Thank you, Ms. Reese. Thank you, Your Honors. Counsel, you have some rebuttal time. Thank you. I'll begin first by addressing, quote, opposing counsel's discussion on the clear error standard. To the extent that the district court made any factual findings, I do not think that that standard is insurmountable in certain circumstances. And I would quote McCrory, this court's opinion that says that, in fact, factual findings are subject to only a clearly erroneous evaluation. But such finding is clearly erroneous if the review of the entire record leaves the appellate court with a definite and firm conviction that the district court's key findings are mistaken. Of course, we believe that to be so. But it goes on to say, this is especially so when the key evidence consisted primarily of documents and expert testimony and credibility evaluations played a minor role. And this court is in the exact same position where we have a number of documents that are contained in the joint appendix, expert testimony, and there were no credibility evaluations that were made. And so, therefore, even under the clearly erroneous standard, this court can make that evaluation. I also wanted to address the mention of Congress's plenary power that has been recognized in immigration study. And it has certainly been recognized in certain immigration settings. It's been recognized in Fialo and Trump. But those settings are different from what the court has before it. In those settings, those decisions and actions were talking to the admission and exclusion of individuals. And in that exercise, Congress does have plenary power. We're not there. We have individuals who are within our borders who are protected by the Fifth Amendment. And Congress does not have plenary power over that. I understand the distinction you're making. It does seem like it would be. I mean, this but this statute does is enforce Congress's decisions about exclusion. And so, I mean, it might be like a half step removed, but they do seem pretty tightly tethered. It would be weird to say we would have to say Congress has plenary power over exclusion, but not plenary power to enforce the statements it makes regarding exclusion. They're very tightly enmeshed. I understand that, Your Honor. And almost what the court is getting to is basically, if we make this decision today, can't Congress just come back and readdress this? Because it's part of that ability. And we're not asking the court to remove Congress's plenary power or asking even the court to say that Congress cannot criminalize illegal reentry and do that. What we are saying is that when there's an improper motive that exists, as it does in 1326 and its enactments and its revisions and its reenactments, that because of that proper motive, the equal protection is violated. And this court should not shy away from correcting Congress where a right to avoid imprisonment. So what do you say Congress is supposed to do? I would reenact the statute that begins mea culpa for all prior times. But we're good to go now. I think Congress should do what it did in analyzing the crack cocaine disparity. And I think Congress should do what it did in even analyzing the 1965 statute, the immigration statute, and dealing with quotas and removing those quotas that Congress can do, as Ramos suggests. But it could reenact exactly the same statute. Certainly, after considering the underlying, just as it did with crack cocaine, considering all the debate surrounding the implementation of crack cocaine, and it may very well reenact the same one or may very well reenact a different one, as they did with crack cocaine, where they changed that from 100 to 1 to 28 to 1. And I also wanted to address this presumption of good faith. There is a presumption of good faith, but it is, in fact, a rebuttable presumption. And we believe that whether there is an improper motive in reenacting a statute, that that is exactly when this court should find that that presumption has been rebutted. Thank you, Your Honor. Thank you very much, counsel. We'll come down and greet at least one of the lawyers in this case and thank Ms. Reese for appearing virtually before moving on to our final case.
judges: Albert Diaz, G. Steven Agee, Pamela A. Harris